**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT RUSSELL HAYES, | ) | CASE NO. 5:14-CV-1323 |
| | ) | |
| Plaintiff, | ) | JUDGE ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | | |

Plaintiff, Robert Russell Hayes ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"), denying his application Period of Disability ("POD") and Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C.

§§ 416(i), 423.  This case is before the undersigned United States Magistrate Judge

pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

On December 14, 2007, Plaintiff filed his application for POD and DIB, alleging a

disability onset date of May 8, 2002.  (Transcript ("Tr.") 111.)  His application was

denied initially and upon reconsideration, and Plaintiff requested a hearing before an

administrative law judge ("ALJ").  (*Id*.)  On November 12, 2010, an ALJ conducted

Plaintiff's hearing.  (*Id*.)  Plaintiff participated in the hearing, was represented by

counsel, and testified.  (*Id*.)  A vocational expert ("VE") also testified.  (*Id*.)  On

December 17, 2010, the ALJ found Plaintiff not disabled.  (Tr. 119.)  Plaintiff requested

review of the decision by the Appeals Council and, on February 16, 2012, the Appeals

Council remanded the case to an ALJ, with instructions to:

> (1) Consider the severity of [Plaintiff's] cervical spine
> impairment and include any corresponding work related
> limitations in the residual functional capacity ("RFC")
> assessment;

> (2) Give further consideration to the nontreating source
> opinion pursuant to the provisions of 20 C.F.R. 404.1527
> and Social Security Rulings [*sic*] 96-5p, and explain the
> weight given to such opinion evidence.  As appropriate, the
> [ALJ] may request the nontreating sources to provide
> additional evidence and/or further clarification of the opinion
> and medical source statements about what [Plaintiff] can still
> do despite the impairment; and

> (3) Give further consideration to [Plaintiff's] maximum [RFC]
> and provide appropriate rationale with specific references to
> evidence of record in support of the assessed limitations.

(Tr. 127.)

On January 9, 2013, a different ALJ conducted a second hearing on Plaintiff's

application for benefits.  (Tr. 11.)  Plaintiff participated in the hearing, was represented

by counsel, and testified.  (*Id*.)  On February 6, 2013, the ALJ found Plaintiff not

disabled.  (Tr. 20.)  On April 19, 2014, the Appeals Council declined to review the ALJ's

decision, and the ALJ's February 2013 decision became the Commissioner's final

decision.  (Tr. 1.)

Thereafter, Plaintiff, *pro se*, filed his Complaint in this Court challenging the

Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in

this matter.  (Doc. Nos. 11-13.)  Plaintiff asserts the following assignments of error:

2

(1) the ALJ erred by failing to consider the effect of Plaintiff's cervical spine impairment on Plaintiffs ability to work; (2) substantial evidence does not support the ALJ's conclusion that Plaintiff's only severe impairment was degenerative disc disease; (3) the ALJ violated the treating physician rule; (4) the ALJ improperly analyzed Plaintiff's credibility; (5) the ALJ failed to include all of Plaintiff's relevant limitations in his hypothetical to the VE, and substantial evidence does not support the ALJ's determination of Plaintiff's RFC; and (6) the ALJ failed to evaluate Plaintiff's psychological impairments.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born in June 1960 and was 47 years old on December 31, 2007, the date last insured.  (Tr. 18.)  He had at least a high school education and was able to communicate in English.  (*Id*.)  He had past relevant work as an office machine servicer, mail carrier, warehouse manager and insurance sales agent.  (*Id*.)

### B.    Medical Evidence

#### 1.    Medical Reports

On January 2, 2002, Peter B. Sinks, M.D., examined Plaintiff who complained of intermittent neck pain and decreased range of motion, as well as dull, throbbing pain in the left shoulder blade that radiated into his left arm.  (Tr. 441.)  He reported that the pain had started after a motor vehicle accident in 1999.  (*Id*.)  Dr. Sinks reviewed a March 2000 MRI provided by Plaintiff, noting that the scan revealed disc protrusions at C5-6 and C6-7.  (*Id*.)  Dr. Sinks diagnosed Plaintiff with chronic mechanical/myofascial,

3

discogenic neck pain with left arm radiculopathy/radiculitis.  (Tr. 441-42.)  He recommended that Plaintiff obtain another MRI and undergo physical therapy.  (Tr. 442.)  He advised Plaintiff to consider epidural steroid injections and prescribed Vioxx and Flexeril.  (*Id*.)

A January 14, 2002 MRI of Plaintiff's cervical spine revealed: narrowed disc interspaces at C5-6 and C6-7; a joint hypertrophy with mild left neural foramen stenosis and partial effacement of the thecal sac at C2-3; a joint hypertrophy with disc protrusion and mild neural foramen stenosis at C3-C4; a broad based disc bulge with mild foramen stenosis at C4-5; broad based extradural defects with spondylotic changes and disc protrusions at C5-6 and C6-7; and patent neural foramina at C7-T1 .  (Tr. 352.)

On January 15, 2002, Plaintiff was examined by Salim Hayek, M.D., who noted Plaintiff's complaints of pain in his left posterior neck, arm and shoulder.  (Tr. 352.)  Plaintiff reported a history of neck pain beginning after an automobile accident in October 1999.  (*Id*.)  The pain was persistent and interfered with physical activity, reaching, lifting and sleeping, which also exacerbated Plaintiff's pain.  (*Id*.)  Plaintiff treated with stretching, massage and heat.  (*Id*.)  He was taking Vioxx and Flexeril, which relieved the pain.  (*Id*.)  Dr. Hayek diagnosed Plaintiff with cervical radiculopathy, cervical facets arthropathy, and myofascial pain syndrome.  (Tr. 353.)  He recommended that Plaintiff undergo trigger point injections and cervical epidural steroid injections, and consider a nerve block.  (*Id*.)

On February 15, March 22, and April 15, 2002, Plaintiff underwent cervical steroid epidural injections.  (Tr. 357, 360, 363.)  Plaintiff reported relief from pain for

4

one week after undergoing the first injection.  (Tr. 360.)  Plaintiff reported experiencing pain in the back of his neck that radiated into his left upper extremity and down to his fingers.  (*Id*.)  Plaintiff also complained of low back pain.  (*Id*.)  On April 23, 2002, Plaintiff underwent a cervical facet joint medial branch nerve block.  (Tr. 366.)  At the time, Plaintiff rated his pain at 4 to 9 out of 10.  (*Id*.)

On May 9, 2002, Juan M. Hernandez, M.D., authored a letter describing Plaintiff's complaints of severe lower back pain radiating into his right leg.  (Tr. 338.) Dr. Hernandez indicated that Plaintiff had sustained the injury on May 8, 2002 while working for Lake Business Products.  (*Id*.)  Plaintiff reported that he was rolling a hand cart up a stair case and heard a "pop" in his lower back when he turned to pull the cart up the last stair onto the landing.  (*Id*.)  He immediately experienced severe pain and was unable to stand up straight.  (*Id*.)  Dr. Hernandez noted that Plaintiff had a history of prior back pain.  (*Id*.)

Dr. Hernandez stated that during his May 9, 2002, examination, Plaintiff presented with an antalgic gait favoring the right extremity and an inability to assume normal/neutral lumbar flexion.  (*Id*.)  Plaintiff had a limited range of lumbosacral motion and decreased sensation over the right thigh.  (*Id*.)  Dr. Hernandez opined that Plaintiff "suffered a severe aggravation of preexisting conditions," and diagnosed him with: aggravation of pre-existing L5-S1 disc herniation; aggravation of pre-existing spondylolisthesis L5 on S1; and lumbosacral sprain/strain.  (*Id*.)  Dr. Hernandez characterized Plaintiff as "temporarily-totally disabled" as a result of the work-related injury.  (*Id*.)

5

A May 9, 2002 scan of Plaintiff's lumbar spine revealed: a bilateral L5 pars defect; grade I anterior spondylolisthesis of L5 on S1; and an old compression deformity at T12.  (Tr. 340.)  On May 29, 2002, Plaintiff complained of bilateral thigh tingling, but stated that it was less intense than the prior week.  (Tr. 341.)

On June 4, 2002, Plaintiff underwent facet radiofrequency ablation to address his cervical spine pain.  (Tr. 372.)

On August 20, 2002, Plaintiff complained to Dr. Hernandez of severe back pain, rated at 7 to 8 out of 10.  (Tr. at 312.)  On August 29, 2002, a physical therapist noted that Plaintiff initially reported "no relief of generalized low back pain," but then indicated that Plaintiff had experienced some relief after physical therapy.  (Tr. 313.)

On September 4, 2002, Ira J. Ungar, M.D., evaluated Plaintiff related to a worker's compensation claim for the injury he sustained while working in May 2002. (Tr. 318-25.)  Dr. Ungar noted that Plaintiff's "allowed condition[s]" were lumbosacral sprain/strain, aggravation of pre-existing spondylolithesis at L5-S1, and aggravation of a pre-existing L5-S1 disc herniation.  (Tr. 318.)  Plaintiff indicated that he was undergoing weekly physical therapy, and performed daily home therapy.  (*Id*.)  Plaintiff had a history of back injuries, including: lumbosacral contusion and strain; cervical strain; L5-S1 disc herniation; and spondylolithesis at L5-S1.  (*Id*.)  Plaintiff reported to Dr. Ungar that he was experiencing low back discomfort, stiffness and soreness, as well as numbness and tingling in his feet.  (Tr. 320.)  His symptoms increased with sitting, and his pain averaged an 8 out of 10.  (*Id*.)  He used muscle relaxers, anti-inflammatories and Vicodin for pain relief, and reported being unable to squat or bend, or to stand for more than 15 minutes.  (*Id*.)

6

Dr. Ungar's examination of Plaintiff's lumbosacral spine revealed no evidence of atrophy or dissymmetry, as well as minimal localized areas of discomfort.  (Tr. 322.) Range of motion was: 80 out of 100 for lumbar spine flexion, 60 out of 70 for sacral flexion, 20 out of 30 for lumbar spine extension, and 15-25 out of 30 for lateral flexion. (*Id*.)  Straight leg raises were negative in the sitting position and positive in the lying position at 30 degrees.  (*Id*.)  Flexing and extending Plaintiff's ankle increased his symptoms, and Dr Ungar noted "dramatic breakaway weakness" at Plaintiff's right ankle.  (*Id*.)  Neurologic testing was normal.  (*Id*.)

Dr. Ungar noted that Plaintiff exhibited "moderately exaggerated pain behavior" throughout the examination.  (Tr. 322.)  He opined that five of seven of the Waddell's signs of "somatic amplification" were positive, "suggesting a moderate level of symptom magnification."  (*Id*.)  In his conclusions, Dr. Ungar opined that Plaintiff was "temporarily and totally disabled" as a result of his moderately severe pain level, but noted that Plaintiff's examination "suggests a significant level of symptom misrepresentation."  (Tr. 324.)  Dr. Ungar diagnosed Plaintiff with mechanical back pain, noting that the lack of diagnostic testing performed on Plaintiff's lower back made it impossible to determine a specific diagnosis.  (*Id*.)

On September 5, 2002, Isador Lieberman, M.D., evaluated Plaintiff's progress with respect to his neck and shoulder pain.  (Tr. 375.)  Plaintiff complained of persistent left arm pain despite the steroid injections, nerve block and ablation.  (*Id*.)  Dr. Lieberman diagnosed Plaintiff with spondylitic changes with degeneration at C3-4, C5-6, and C6-7.  (*Id*.)  He recommended that Plaintiff consult with a surgeon, and consider

7

further ablation and physical therapy.  (*Id*.)

On September 10, 2002, Plaintiff reported to a physical therapist that he felt "less back pain" after one or two weeks of therapy, but was "frustrated" that it was "taking so long to improve."  (Tr. 315.)  Plaintiff was considering a pain block.  (*Id*.)  On September 17, 2002, a physical therapist noted Plaintiff's report that he was "feeling better at low back," and that his pain had decreased after the last physical therapy session.  (Tr. 316.)  On September 24, 2002, Plaintiff indicated that the cold weather was making his back stiff, but stated that he was experiencing less peripheral leg pain.  (Tr. 317.)

A March 23, 2003 EMG of Plaintiff's left arm revealed no evidence of cervical radiculopathy.  (Tr. 447.)  A July 24, 2003 MRI of Plaintiff's lumbar spine revealed mild degenerative disc disease, findings suspicious for bilateral pars defect at L5, and mild degenerative facet disease.  (Tr. 853.)  In October 2003, Plaintiff underwent a nerve conduction study in his lower extremities, which yielded normal results.  (Tr. 654.)

In December 2004, Dr. Lieberman examined Plaintiff, who complained of lower back pain.  (Tr. 379.)  Dr. Lieberman noted that Plaintiff had a normal gait and no pain to palpitation of his cervical, thoracic or lumbar sprain.  (Tr. 381.)  Plaintiff had paraspinal palpable tenderness on the left side of his lower lumbar and sacral spine. (*Id*.)  Dr. Lieberman recommended that Plaintiff undergo an MRI.  (*Id*.)

On February 17, 2005, Plaintiff underwent a diagnostic discography procedure. (Tr. 383.)  The procedure revealed an unspecified disc condition in the lumbar region as well as lumbar disc displacement.  (*Id*.)  The report noted symptomatic discs at L2-3, L3-4, and L5-S1.  (Tr. 383-84.)  The surgeon recommended performing Intradiscal Electrothermal Annulopasty ("IDET") and fusion.  (Tr. 384.)

On February 28, 2005, Dr. Lieberman noted that he had reviewed the results of Plaintiff's discography as well as a January 27, 2005 MRI.  (Tr. 387.)  The MRI revealed "multiple level degenerative changes at every single lumbar intervertebral disc," and "quite severe degenerative changes" at T12-L1, L1-2, L2-3, and L3-4.  (*Id.*)  Dr. Lieberman opined that, while he might consider surgical options if Plaintiff's condition deteriorated, at the time, Plaintiff would continue nonoperative treatments.  (*Id.*)

On April 12, 2005, Paul T. Scheatzle, D.O, performed an independent medical examination at the request of Worker's Compensation.  (Tr. 579.)  Plaintiff described an aching pain in his lower back, accompanied by stabbing pain and numbness in his right thigh and both feet.  (Tr. 580.)  Dr. Scheatzle opined that Plaintiff could return to his former employment, and advised light duty restrictions, with no climbing, crawling, or repetitive bending or twisting.  (Tr. 582.)  Dr. Scheatzle opined that Plaintiff could lift up to 20 pounds, or 10 pounds frequently.  (*Id.*)

On June 13, 2005, Dr. Lieberman discussed the potential of an L5-S1 fusion to relieve Plaintiff's symptoms.  (Tr. 388-89.)  Plaintiff agreed to consider surgery.  (Tr. 389.)

Plaintiff underwent physical therapy for his lower back pain in November and December 2005, and January, February and March 2006, on the referral of Norman Lefkovitz, M.D..  (Tr. 753-802, 804.)  During a November 15, 2005 physical therapy evaluation, Plaintiff reported constant low back pain that radiated into his lower extremities, as well as numbness in his feet.  (Tr. 804.)  His pain was aggravated by bending, prolonged sitting and standing, and rising from a chair.  (*Id.*)

On March 10, 2006, Plaintiff's therapist noted that Plaintiff showed "no signs of

pain reaction" with "exercise" on that date.  (Tr. 763.)  On March 20, 2006, Plaintiff's therapist noted that he was compliant with therapy, and stated that his function was improving, but his pain was not decreasing with therapy.  (Tr. 757.)  On March 23, 2006, he reported to his physical therapist that his neck had "blown out" at home for no apparent reason the night before.  (Tr. 753.)  His therapist advised him to avoid upper body exercises.  (Tr. 754.)

A February 23, 2006, Plaintiff underwent a functional capacity evaluation.  (Tr. 501-02.)  The report concluded that Plaintiff functioned in the medium physical demand category.  (Tr. 520.)  The report opined that Plaintiff could frequently: carry up to 40 pounds; stoop; crouch; kneel; reach, bi-manually handle and finger; and stand/sit.  (Tr. 502.)  He could occasionally stoop.  (Tr. 519.)  Plaintiff demonstrated decreased grip strength in his right hand, and the report noted that he had undergone a partial thumb amputation in 1980.  (Tr. 520.)

954

The record contains evidence of ongoing treatment beyond the period ending on December 31, 2007 – Plaintiff's date last insured.  This evidence includes:

•    Treatment with pain management specialist James Bressi, M.D., between October 2008 and January 2012.  (Tr. 879-81, 1007-1027, 1168.)

•    An October 21, 2008 examination by Mark Grubb, M.D., who diagnosed Plaintiff with bulging discs and spondylolisthesis in his lumbar spine. (Tr. 904-05.)

•    Physical therapy, upon referral from Dr. Bressi, beginning in March 2009 (Tr. 958-79.)

•    Treatment, including acupuncture and physical therapy, from pain management

10

physician Yue P. Mok, M.D., between February 2009 and June 2012 (Tr. 980-92, 1072-84.)

• Counseling sessions with Robert F. Dallara, Jr., Ph.D., who diagnosed Plaintiff with depression and pain disorder.  The record contains notes of counseling sessions from April 2009 through July 2012. (Tr. 994-97, 1144-57.)  In a February 2012 letter, Dr. Dallara opined that Plaintiff could not return to work because exposure to work-related stress would cause Plaintiff to "decompensate with significant worsening of his symptoms."  (Tr. 1171.)

• Treatment with pscyhiatrist Kanubhai C. Patel, M.D., who managed Plaintiff's prescriptions for Wellbutrin, Ativan, and Lunesta.  The record contains notes from Dr. Patel from July 2009 through July 2012.  (Tr. 1031-55, 1119-43.)

• A July 14, 2010 psychological evaluation prepared at the request of Worker's Compensation, in which examining psychologist Gregg A. Martin, Ph.D., opined that Plaintiff's "mood and coping issues" rendered him incapable of working without "restrictions or modifications."  (Tr. 1004.)

• An August 23, 2010 pain management consultation with David Gutlove, M.D., who opined that Plaintiff should undergo additional steroid injections and medial branch blocks.  (Tr. 1029-30.)

• A January 13, 2011 psychological evaluation prepared at the request of Worker's Compensation, in which examining psychologist James M. Lyall, Ph.D., opined that, due to Plaintiff's "high level of emotional symptoms, which he is converting into a worsening of his pain and health complaints," it would be "difficult" for Plaintiff to return to gainful employment.  (Tr. 1062-66.)

11

- A January 13, 2011 psychological evaluation prepared at the request of Worker's Compensation, in which examining psychologist Joseph D. Perry, Ph.D., opines that "the nature and severity" of Plaintiff's "symptoms regarding pain disorder associated with both psychological factors and a general medical condition would limit him in his ability to work."  (Tr. 1178.)

2.      **Agency Reports**

On March 4, 2008, agency consulting physician Diane Manos, M.D., completed a physical RFC assessment.  (Tr. 854-61.)  She opined that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, and could stand, walk, and sit for about 6 hours in an 8-hour workday.  (Tr. 855.)  Dr. Manos determined that Plaintiff should never climb ladders, ropes or scaffolds; and could frequently stoop and crouch.  (Tr. 856.)

On July 14, 2008, agency consulting psychologist Ruth M. Haude, Ph.D., examined Plaintiff.  (Tr. 871-76.)  Plaintiff described a history of manic depression, and anxiety and depression, with occasional suicidal thoughts.  (Tr. 872.)  Dr. Haude diagnosed Plaintiff with chronic adjustment disorder with mixed anxiety and depressed mood, alcohol abuse in sustained partial remission, and polysubstance dependence, in sustained full remission.  (Tr. 876.)  She noted that Plaintiff was "suffering from enormous levels of frustration and anger and literal helplessness, which is not uncommon in individuals facing the considerable inertia which often characterizes the Workers' Compensation system."  (*Id*.)  Dr. Haude opined that Plaintiff was not impaired in his ability to: understand and follow instructions; maintain attention to perform simple, or multi-step, repetitive tasks; or relate to others, including fellow workers and supervisors.  (*Id*.)  She concluded that he was markedly impaired in his ability to

withstand the stress and pressures associated with day-to-day work activity and other activities." (*Id*.)  She noted that this final limitation was "due to his lack of access to appropriate medical services, according to his own report." (*Id*.)

On August 12, 2008, agency consulting psychologist Tonnie Hoyle, Psy. D., performed a mental RFC assessment and psychiatric review technique.  (Tr. 883-85, 886-900.)  She determined that Plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting.  (Tr. 883-84.)  Dr. Hoyle assigned Plaintiff moderate limitations in social functioning and maintaining concentration, persistence and pace; and mild limitations in his activities of daily living.  (Tr. 897.)

On November 19, 2008, agency consulting physician Rebecca R. Neiger, M.D., performed a physical RFC assessment.  (Tr. 906-13.)  She opined that Plaintiff could: lift 20 pounds occasionally and 10 pounds frequently; and stand and/or walk, and sit for 6 hours in an 8-hour workday. (Tr. 907.)  Dr. Neiger concluded that Plaintiff could: never climb ladders, ropes or scaffolds; and could occasionally stoop and crouch.  (Tr. 908.)  She stated that Plaintiff should avoid all exposure to hazards.  (Tr. 910.)

**C.   Hearing Testimony**

    **1.        Plaintiff's January 9, 2013 Hearing Testimony**

At the administrative hearing held on remand from the Appeals Council, Plaintiff testified as follows:

Plaintiff's neck pain caused him to be unable to turn his neck without also turning his body.  (Tr. 81-82.)  The pain made it difficult to bend his head and work with his hands.  (Tr. 82.)  He had undergone facet blocks and other neurological treatments, to no avail.  (*Id*.)  His pain radiated into his arms, and was exacerbated by activity.  (*Id*.)  He also experienced numbness and tingling in his left hand.  (*Id*.)  Plaintiff was unable to bend his neck down long enough to wash dishes.  (Tr. 83.)  Although Plaintiff had completed computer training through Worker's Compensation, he had only been able to do so by taking on-line classes, which allowed him to work at his own pace and in blocks of time.  (*Id*.)  Sitting at the computer and looking at the screen caused him beck pain and "intense" headaches.  (*Id*.)  Sometimes the headaches lasted all day.  (*Id*.)

Plaintiff took oxycodone for pain, but the pills made him nauseous and dizzy. (Tr. 84.)  He could sit for about ten minutes before experiencing pain, and then had to stand up and walk.  (Tr. 84-85.)  He lived with his girlfriend of 14 years, and had no children.  (Tr. 86.)  He was able to drive, but only drove for around 15 minutes at a time and within a few blocks of his home.  (Tr. 87.)  He drove only once each week or every two weeks.  (Tr. 87-88.)  His girlfriend did all of the shopping and most of the driving. (Tr. 88.)  Plaintiff typically spent most of his day in a recliner, watching television.  (*Id*.) He stretched in the mornings to reduce his pain.  (*Id*.)  He was able to use a computer

for five or ten minutes at a time.  (Tr. 89.)  He was able to attend to his personal needs without assistance.  (Tr. 88-89.)

Plaintiff began experiencing depression in 2004.  (Tr. 96.)[1]  At first, Plaintiff noticed that he had lost interest in "doing anything," and was preoccupied.  (*Id*.)  He did not obtain treatment then because he had no insurance.  (*Id*.)  He started receiving treatment after his attorney requested that Worker's Compensation allow it.  (*Id*.)  Prior to receiving treatment and medications, Plaintiff was anxious and unable to concentrate on simple tasks such as counting money.  (Tr. 96-97.)  He could not be alone in a room by himself without "freaking out."  (Tr. 97.)  At the time of the hearing, he did not engage in any outside activities, noting, "I don't like people."  (Tr. 98.)

### 2.    Vocational Expert's Hearing Testimony

The ALJ informed the VE that he intended upon finding that Plaintiff could not perform any of his past relevant work.  (Tr. 92.)  The ALJ asked the VE to identify jobs in the sedentary range of exertion, with sit-stand option defined as "the ability to at will stand and stretch, not for any extended period of time, and not to move distant from the work station, but to at will stand and stretch to alleviate discomfort."  (*Id*.)  The ALJ confirmed that the VE was aware of Plaintiff's age and education level.  (Tr. 93.)  The VE opined that the individual described by the ALJ would be able to perform work as a telephone solicitor, an electrical assembler, or a superconductor assembler.  (Tr. 94-95.)

---

[1] Although all of the medical evidence regarding Plaintiff's mental health arose after the date he was last insured, the ALJ noted that the record contained evidence of Plaintiff's psychological treatment, and permitted Plaintiff's counsel to question him regarding his mental impairment.  (Tr. 95-96.)

### D.    Post-Hearing Interrogatories

During the hearing, the ALJ indicated that he would obtain interrogatories from a medical source.  (Tr. 91.)  On January 14, 2013, Charles L. Cooke, M.D., completed interrogatories.  (Tr. 1159-67.)  He opined that Plaintiff could: frequently lift and carry up to 20 pounds; sit for 4 hours, stand for 3 hours, and walk for 2 hours without interruption; sit for 6 hours, stand for 4 hours and walk for 3 hours total during an 8-hour workday.  (Tr. 1159-61.)  Dr. Cooke concluded that Plaintiff could frequently: reach; handle; finger; feel; push and pull with both hands; balance; stoop; kneel; operate a moving vehicle; and be exposed to vibrations and loud noises.  (Tr. 1161-63.)  Plaintiff could occasionally: climb ramps and stairs; crouch; crawl; and be exposed to moving mechanical parts, and extreme temperatures.  (Tr. 1161-63.)  Plaintiff could never be exposed to unprotected heights.  (Tr. 1163.)

Dr. Cooke opined that Plaintiff could perform all of the activities of daily living listed in the interrogatory, including shopping, traveling without a companion, ambulate, walk on uneven surfaces, use public transportation, prepare simple meals and engage in personal hygiene.  (Tr. 1164.)  Dr. Cooke noted that Plaintiff had "no neurological or musculoskeletal deficits to prevent" him from performing these tasks.  (*Id*.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981).*  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

17

## IV.   SUMMARY OF COMMISSIONER'S DECISION

In the February 2013 decision issued in response to the Appeals Council's remand, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

2.   The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 8, 2002 through his date last insured of December 31, 2007.

3.   Through the date last insured, the claimant had the following severe impairment: degenerative disc disease.

4.   Through the date last insured, the claimant did not have an impairment or a combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Through the date last insured, the claimant had the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except that he must have a sit and stand option where he can briefly stand and stretch at his work station to alleviate discomfort. This would not be for an extended period, and it would not require him to move a distance from his work station.

6.   Through the date last insured, the claimant was unable to perform any past relevant work.

7.   The claimant was born in June 1960 and was 47 years old, which is defined as a younger individual age 18-44,[2] on December 31, 2007, the date last

_____

[2] This is apparently an error, as an individual who is 47 years old is not defined as a younger individual age 18 to 44.  This error, however, is harmless in this case. Under the Medical-Vocational Rules, an individual who, like Plaintiff, is 45 to 49, with at least a high school education and past semi-skilled and skilled work, is considered not

insured.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.

10.  Through the date last insured, considering claimant's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11.  The claimant was not under a disability, as defined in the Act, at any time from May 8, 2002, the alleged onset date, through December 31, 2007.

(Tr. 13-20.)

## LAW & ANALYSIS

### A.  Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the

disabled.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 2, Rules 201.19, 201.20.

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

Plaintiff asserts the following assignments of error: (1) the ALJ erred by failing to consider the effect of Plaintiff's cervical spine impairment on Plaintiffs ability to work; (2) substantial evidence does not support the ALJ's conclusion that Plaintiff's only severe impairment was degenerative disc disease; (3) the ALJ violated the treating physician rule; (4) the ALJ improperly analyzed Plaintiff's credibility; (5) the ALJ failed to include all of Plaintiff's relevant limitations in his hypothetical to the VE and in the RFC determination; and (6) the ALJ failed to properly evaluate Plaintiff's psychological impairments.

**1.      The ALJ's Failure to Address Plaintiff's Cervical Spine Impairment**

Plaintiff argues that the ALJ erred when he failed to consider whether and how Plaintiff's cervical spine impairment affected Plaintiff's ability to work.  The

Commissioner does not respond to this specific argument.  In its order remanding the case to the ALJ, the Appeals Council instructed that, on remand, the ALJ should, *inter alias*, "consider the severity of [Plaintiff's] cervical spine impairment and include any corresponding work related limitations in the residual functional capacity ("RFC") assessment."  (Tr. 127.)  Plaintiff argues that the ALJ's failure to address the severity of his neck impairment requires remand in this case.

The Sixth Circuit has not determined whether an ALJ's failure to follow an Appeals Council directive constitutes an independent ground for remand.  *See, e.g., Kearney v. Colvin*, 14 F. Supp.3d 943, 50 (S.D. Ohio 2014) (collecting and discussing cases addressing the issue).  In *Kearney*, the Appeals Council remanded the case to the ALJ with instructions to obtain the claimant's file and review it to determine whether good cause existed to reopen a prior determination and establish a closed period of disability.  On remand, the ALJ did not conduct a good cause analysis with respect to the proposed closed period of disability.  Rather, he obtained the claimant's entire record – including medical records that predated the prior determination and the proposed closed period of disability – reviewed all of the evidence, and determined that Plaintiff had not been disabled at any point prior to the expiration of her date last insured.

In the district court, the claimant argued that the ALJ's failure to consider whether there was good cause to reopen the prior determination was an independent ground for remand.  Noting that the Sixth Circuit had not decided the issue, the district court assumed that such a failure may serve as an independent ground for reversal, but

21

declined to remand on that basis in that case.  Rather, the court in *Kearney* concluded that, despite the ALJ's failure to comply with the specifics of the remand order, the ALJ had "met the directives" of the order and, thus, that failure was not sufficient cause for remand.  14 F Supp.3d at 950.  (In obtaining and reviewing the entire record, including evidence that predated the proposed closed period of disability, the ALJ's review "essentially functioned as a constructive reopening of the [prior] determination.  This was the equivalent of any substantive review [the ALJ] would have made in an affirmative finding that 'good cause' existed to reopen the record.").

Remand is not required in this case for similar reasons.  Although the ALJ did not engage in an analysis that specifically isolated the effect of Plaintiff's cervical impairment on his ability to perform work, the ALJ engaged in a review of the entire record, including medical evidence reflecting the condition of Plaintiff's neck.  (*See, e.g.,* Tr. 15-16.)  In doing so, the ALJ considered various opinions regarding how Plaintiff's various physical conditions affected his ability to engage in work-related activities.  (Tr. 16 (discussing the February 2006 functional capacity evaluation), 17-18 (discussing the agency's physical RFC assessments).)  In other words, as in *Kearney*, the ALJ's review of the entire record in this case served the same purpose as reviewing only the evidence related to Plaintiff's cervical spine.  Here, the ALJ's review "met the directives" of the remand order.

Further, Plaintiff points to nothing in the record that supports any argument that, had the ALJ specifically discussed Plaintiff's cervical impairment and its effect on his ability to work, the evidence would have supported Plaintiff's claim of disability.  Although the record contains ample evidence that Plaintiff's cervical spine had multiple

22

issues, Plaintiff points to no evidence – and the record contains no evidence – that the condition of his cervical spine precluded him from working.  Rather, the record contains descriptions of Plaintiff's condition – the results of scans and examinations of his neck – that do not describe how that condition affected his ability to work.  *See, e.g., Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").  Accordingly, this argument raises no basis for remand in this case.

### 2.    Plaintiff's Severe Impairments

Plaintiff argues that the ALJ erred at Step Two of the sequential analysis when he determined that degenerative disc disease was Plaintiff's only severe impairment.  Specifically, Plaintiff argues that the ALJ should have determined that Plaintiff also had severe impairments arising out of his cervical spine, lumbar spine, amputated left thumb, psychological factors, and the side effects of his pain medication.  This argument lacks merit.  Even if the ALJ erred in concluding, at step two of his analysis, that Plaintiff's only severe impairment was degenerative disc disease, that error is harmless.  Although the determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process, *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988), the goal of the test is to screen out totally groundless claims, *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once an ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; accordingly, any failure to identify other impairments or combinations of impairments as severe would be only harmless error

because step two would be cleared.  *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) ("Because the ALJ found that Pompa had a severe impairment at step two of the analysis, the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence.").  Here, although the ALJ did not find that Plaintiff suffered from multiple severe impairments, he did conclude that Plaintiff's degenerative disc disease was a severe impairment.  (Tr. 14.)  Accordingly, Plaintiff cleared step two of the analysis, and Plaintiff's argument that the ALJ erred at step two does not merit remand.  *See Anthony*, 266 F. App'x at 457.

### 3. The Treating Physician Rule

Plaintiff argues that the ALJ improperly applied the treating physician rule when he "rejected the opinion of [P]laintiff's treating physicians without explanation."  (Pl. Br. at unnumbered p. 6.)  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL

24

374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by

the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and

its purpose is to "let claimants understand the disposition of their cases" and to allow for

"meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation

marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating

physician's opinion less than controlling weight, the error is not harmless and the

appropriate remedy is remand.  *Id.*

　　　Here, Plaintiff does not identify the relevant treating physician whose opinion

the ALJ erroneously analyzed.  With respect to his physical impairments, review of the

record reveals that none of Plaintiff's treating physicians actually provided medical

opinions regarding his physical limitations.  Rather, the evidence in the record supplied

by those physicians who treated Plaintiff's physical impairments consists of treatment

notes, examination results and descriptions of scans.  These items do not reflect

"judgments about the nature and severity of" Plaintiff's impairments, and thus do not

constitute medical opinions for the purposes of the treating physician rule.  20 C.F.R.

§ 404.1527(a)(2).  In his Brief, Plaintiff argues that the ALJ ignored the opinion of an

unidentified treating source who concluded that Plaintiff could sit for only 10 or 15

minutes at a time.  (Pl. Br. at unnumbered p. 10.)  Review of the record reveals that

Plaintiff reported to Dr. Ungar, a state agency consultant, that he could stand for no

more than 15 minutes at a time.  (Tr. 320.)  A state agency consulting physician's

memorialization of Plaintiff's statement regarding his ability to stand does not constitute

the medical opinion of a treating source.

　　　The record does contain the opinions of physicians and other medical sources

25

who treated Plaintiff for his psychological condition. In his decision, the ALJ assigned "little weight" to those opinions:

> These opinions are given little weight as they reflect more recent treatment and are inconsistent with the medical evidence from the time period of 2002 through 2007. While the claimant has had recent treatment with Dr. Dallara, he was not having any mental health treatment in 2007.

(Tr. 14.) This analysis does not constitute error. There is no dispute that the relevant time period in this case is from May 2002 – the alleged onset date – until December 31, 2007 – the date on which Plaintiff was last insured. Plaintiff did not receive treatment for psychological conditions during the relevant period of time.[3] Further, none of the medical sources who treated Plaintiff for his psychological issues offered any opinion regarding Plaintiff's mental condition during the relevant period of time. Accordingly, substantial evidence in the record supports the ALJ's reasons for assigning less than controlling weight to the opinions of Plaintiff's treating psychiatrist and psychologist.

### 4. Plaintiff's Credibility

Plaintiff argues that the ALJ erred in finding him not credible. In the decision, the ALJ found that Plaintiff was not credible regarding the "intensity, persistence and limiting effects" of his symptoms, "for the reasons explained in this decision." (Tr. 15.) Immediately thereafter, the ALJ noted, "The medical evidence of record demonstrates improvement in the claimant's condition from the alleged onset date and is consistent

---

[3] The ALJ's conclusion on this point is consistent with the earlier finding of the first ALJ in this case, whose December 2010 order acknowledged that the record contained evidence "of a mental impairment that could possibly be considered severe," but concluded that the impairment was "not established on or before the date last insured in this matter." (Tr. 113.)

26

with the ability to perform sedentary work with a brief sit and stand option." (*Id.*) Although the ALJ did not explicitly address Plaintiff's credibility at any other subsequent point in the decision, in his discussion of the medical evidence, the ALJ noted Dr. Ungar's observation that Plaintiff displayed "five of seven Waddell signs of somatic amplification . . . suggesting a moderate level of symptom magnification." (Tr. 16 (referring to Tr. 322).)

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly. *See Siterlet v. Sec'y of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987); Villarreal v. Sec'y of Health & Human Servs., 818 F.2d 461, 463 (6th Cir. 1987).* However, the ALJ's credibility determinations must be reasonable and based on evidence from the record. *See Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 249 (6th Cir. 2007); Weaver v. Sec'y of Health & Human Servs., 722 F.2d 313, 312 (6th Cir. 1983).* The ALJ also must provide an adequate explanation for his credibility determination. "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.). Rather, the determination "must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

The ALJ's credibility analysis in this case presents a close question. The

27

decision contains very little discussion of the specific issue of Plaintiff's credibility.  The ALJ's reference to Dr. Ungar's opinion that Plaintiff was exaggerating his symptoms was the only time that the ALJ pointed to specific evidence in the record that undermined Plaintiff's credibility.  In another case, this dearth of discussion may be insufficient to avoid remand.  In this case, however, the ALJ's general statement – that the record evidence is consistent with his finding that Plaintiff could perform sedentary work – considered in light of the entire record is sufficient to support the adverse credibility finding.  This is because, other than Plaintiff's own allegations, the record is devoid of evidence that Plaintiff's symptoms were as debilitating as he alleged.  None of the capacity evaluations in the record concluded that Plaintiff was incapable of sedentary work.  Indeed, at least three of them – those conducted by Drs. Scheatzle, Manos and Neiger – assigned Plaintiff less restrictive limitations than those ultimately assigned by the ALJ. (Tr. 17 (ALJ discussing Dr. Scheatzle's opinion that Plaintiff could return to work with light duty restrictions and assigning it "some weight" because "the medical evidence as a whole is more consistent with a limitation to sedentary work with a sit and stand option"), 17-18 (ALJ assigning "limited weight" to Dr. Manos's opinion that Plaintiff could perform medium exertional work and to Dr. Neiger's opinion that Plaintiff could perform light exertional work, noting that "the evidence demonstrates greater limitations that would prevent [Plaintiff] from lifting such a great amount of weight as required" at those levels).)  There is simply no medical opinion that supports Plaintiff's claim that he is incapable of working as a result of his physical impairments.  Accordingly, substantial evidence supports the credibility finding in this case.  *See* *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004)  (When "remand

would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game." ) (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)).

Plaintiff contends that the ALJ erred in relying on Waddell's signs[4] to conclude that Plaintiff's allegations regarding the severity of his impairments were not credible. He cites to two cases, *Hedden v. Comm'r of Soc. Sec.*, No. 1:10-CV-534, 2011 WL 7440949 (W.D. Mich. Sept. 6, 2011) (Carmody, M.J.), and *Jadwin v. Astrue*, No. 3:07-CV-189, 2008 WL 4372659 (S.D. Ohio Sept. 19, 2008) (Rose, J.), in which district courts have determined that an ALJ erred in relying on the presence of Waddell's signs during an examination to conclude that a claimant was not credible.  Neither of these cases, however, compels the conclusion that the ALJ erred in making his credibility finding in this case.  As a preliminary matter, these cases are not binding on this Court. Neither the Sixth Circuit nor this Court has determined that it is error for an ALJ to rely on Waddell's signs to determine that a claimant lacks credibility.

Further, the facts of *Hedden* and *Jadwin* are distinguishable from the present case.  In those cases, the ALJ relied entirely on the presence of Waddell's signs to make an adverse credibility finding.  The physicians who reported the signs did not opine regarding their significance with respect to the claimant's credibility.  *See, e.g., Hedden*, 2011 WL 7440949 at *13 (noting that the physician who reported the presence

---

[4] Generally, Wadell's signs "were developed to identify psychogenic, or nonorganic, manifestations of pain in patients that may have heightened emotional effects on their conditions. . . .  They have also been associated with detecting malingering in patients with complaints of lower back pain."  Waddells Sign, www.physio-pedia.com/Waddells_Sign (last visited July 28, 2015).

29

of Waddell's signs also reported that the claimant's pain behaviors were normal);

*Jadwin*, 2008 WL 4372659 at *8 (noting that the physician who reported the Waddell's

signs "did not state that he believed [the plaintiff] to be exaggerating her symptoms").  In

this case, in addition to noting the Waddell's signs in her report, Dr. Ungar also opined

that their presence suggested that Plaintiff was significantly misrepresenting his

symptoms.  (Tr. 324.)  Although the ALJ noted Dr. Ungar's opinion regarding Plaintiff's

exaggeration of his symptoms in his decision, the ALJ did not rely only on the presence

of Waddell's signs to find a lack of credibility.  Rather, unlike *Jadwin*, the ALJ noted that

Plaintiff's examining physician had opined that Plaintiff was misrepresenting his

symptoms.  Plaintiff's arguments regarding the ALJ's credibility analysis lack merit and,

thus, present no basis for remand in this case.

### 5. The ALJ's Hypothetical to the VE and the RFC Determination

Plaintiff argues that the ALJ erred by failing to include all of Plaintiff's relevant

limitations in his hypothetical to the VE.  Similarly, he contends that, because the ALJ's

RFC determination did not include all of Plaintiff's limitations, it is not supported by

substantial evidence.  Specifically, Plaintiff asserts that the ALJ erred in failing to

include limitations arising out of Plaintiff's "cervical spine movement, limitations related

to L12-T1 vertebral locations, amputated left thumb, psychological factors and side

effects caused by pain medication."  (Pl. Br. at unnumbered p. 7.)  This argument lacks

merit.  Plaintiff points to nothing in the administrative transcript that supports his claim

that the ALJ should have included additional limitations in his hypothetical to the VE

and the RFC calculation.  Plaintiff does not identify the limitations that the ALJ allegedly

omitted.  Although the conditions enumerated by Plaintiff are present in the record, no

medical evidence in the record supports the need for additional limitations, particularly in light of the fact that the ALJ assigned limitations that are more restrictive than those suggested by the examining experts.  Accordingly, this argument presents no basis for remand in this case.

### 6.    Plaintiff's Psychological Conditions

Finally, Plaintiff contends that the ALJ improperly evaluated Plaintiff's psychological impairments.  As discussed above, however, the record contained no evidence that Plaintiff was suffering from a mental impairment during the relevant period of time.  It is well established that a claimant bears the burden of establishing the existence and severity of his impairments.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Landsaw v. Sec'y of Health & Human Services*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant."); 20 C.F.R. §§ 416.912(a) ("In general, you have to prove to us that you are blind or disabled.").  Plaintiff, who was counseled at the administrative level, failed to offer evidence of a psychological impairment during the relevant period of time in this case and, thus, failed to meet his burden with respect to this issue.

Plaintiff, who was counseled at the time of the hearing, contends that the ALJ erred in failing to inquire as to why Plaintiff did not seek treatment for his psychological impairments during the relevant period of time. During his second administrative hearing, Plaintiff testified that, although he had been diagnosed with depression in 1994, he had not initially sought treatment because he could not afford it.  (Tr. 96.)

According to Plaintiff, in light of Plaintiff's testimony on this issue, the ALJ erred in relying on Plaintiff's lack of treatment for psychological conditions as a basis for declining to find disability as a result of those conditions without first obtaining additional medical information regarding Plaintiff's mental condition during the relevant period of time.

Plaintiff cites to two cases, *Burton v. Apfel*, 208 F.3d 212 (Table), 2000 WL 125853 (6th Cir. 2000) (unpublished opinion); and *Munson v. Astrue*, No. 11-12475, 2012 WL 4485824 (E.D. Mich. Aug. 6, 2012) (Whalen,M.J.), to support his argument. Neither of these cases, however, compels the conclusion that the ALJ erred with respect to this analysis of this issue.  In *Burton*, the ALJ pointed to, *inter alias*, the fact that the plaintiff had not been referred for mental health treatment to support his conclusion that the plaintiff was not disabled.  In that case, however, the record was replete with other evidence that the plaintiff had a mental impairment, including her own testimony and notes in her medical records.  The Sixth Circuit concluded that, in light of this other evidence, it was improper for the ALJ to have relied on the plaintiff's lack of treatment to find that she did not have a severe mental impairment.  2000 WL 125853 at *4.  In this case, although there was evidence that could support the conclusion that Plaintiff suffered from a severe psychological impairment after 2008, the record was entirely devoid of such evidence applicable to the relevant period of time.

In *Munson*, the ALJ relied on the plaintiff's failure to pursue treatment for her psychological impairments as a basis to conclude that she was not credible with respect to the severity of her limitations.  The magistrate judge concluded that this was error, noting that Social Security Ruling ("S.S.R") 96-7p specifically prohibited an ALJ from

relying on a claimant's lack of treatment, without further inquiry, to draw any inference regarding that claimant's symptoms or their functional effects.  2012 WL 4485824 at * 9-10.  In this case, the ALJ did not conclude that Plaintiff lacked credibility with respect to his psychological impairments.  Rather, the ALJ correctly observed that the record simply did not support the conclusion that any such impairment existed during the relevant period of time.  Plaintiff points to no authority – and research reveals none – requiring an ALJ, who is presented with a record containing no evidence that the claimant suffered from psychological impairments during the relevant of time, to engage in further evidence gathering prior to making a determination on this issue.  Any such decision would undermine well established law that it is the claimant's burden to establish the nature and severity of his impairments, particularly where, as here, the claimant was counseled at the administrative level.

Here, review of the record reveals that there was no evidence to support the conclusion that, during the relevant period of time, Plaintiff suffered from a psychological impairment that rendered him disabled.  Accordingly, the ALJ's conclusion on this point is supported by substantial evidence, and this argument presents no basis for remand in this case.

## VI.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 28, 2015


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**